FILED

2015 Feb-17  PM 12:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **DEBORAH ROYER,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **5:13-CV-01573-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On June 24, 2010, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits. She initially alleged onset of her disability beginning January 17th, 2010, a date that was later amended to January 1, 2011. All claims were initially denied on October 4, 2010. The claimant then filed a written request for hearing before an Administrative Law Judge on October 11, 2010, and the ALJ held a hearing in Florence, Alabama on March 20, 2012.

In a decision dated May 4, 2012, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for disability benefits. (R. 21). The Appeals Council then denied the claimant's request for review, and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court will REVERSE and REMAND the decision of

1

the Commissioner.

## II. ISSUE PRESENTED

The claimant presents the following issue for review: whether substantial evidence supports the ALJ's omission of Dr. Blackmon's limitation that the claimant would need to miss one to two days per month because of her anxiety from the ALJ's residual functional capacity assessment.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*" Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*, but will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the Plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and

the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence exists in the record to support it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app.1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520,

416.920.

Social Security Ruling 96–8p provides guidance regarding residual functional capacity assessments:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. §404.1545 and §416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ must first assesses the claimant's functional limitations and restrictions and then expresses her functional limitations in terms of exertional levels. *See Castel v. Comm'r of Soc. Sec.,* 355 F. App'x 260, 263 (11th Cir.2009); *Freeman v. Barnhart,* 220 F. App'x 957, 959–60 (11th Cir.2007); *see also Bailey v. Astrue,* 5:11–CV–3583–LSC, 2013 WL 531075 (N.D. Ala. Feb. 11, 2013).

The ALJ must consider all of the relevant evidence in assessing the claimant's functional limitations, including

> medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations, if available.

SSR 96–8p at *4–*5. However, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to show that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir.2005); *see also Castel,* 355 F. App'x at 263.

4

An ALJ's RFC determination is not a medical assessment, but is "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 404.1545(a)(1). The ALJ makes this determination by considering the claimant's physical, mental, and other abilities affected by the impairment(s). 20 C.F.R. § 404.1545(b)-(d), [20 C.F.R. § 416.945(b)-(d)].

The claimant bears the burden of demonstrating that she cannot return to her past relevant work. *Lucas v. Sullivan,* 918 F.2d 1567, 1571 (11th Cir. 1990). If the claimant is unable to do past relevant work, the examiner determines whether, in light of the claimants's residual functional capacity, age, education, and work experience, the claimant can perform other work. *Wilson v. Barnhart,* 284 F.3d 1219, 1227 (11th Cir. 2002).

The ALJ may determine whether the claimant has the ability to perform other work in the national economy by use of a vocational expert. *Phillips v. Barnhart,* 357 F.3d 1232, 1239 (11th Cir. 2004). The ALJ must articulate specific jobs that the claimant is able to perform, and substantial evidence must support this finding. *Id*. For a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. *Vega v. Comm. of Social Security,* 265 F.3d 1214, 1220 (11th Cir. 2001).

## V. FACTS

The claimant was forty-eight years old at the time of the administrative hearing and earned GED. The claimant worked at Cinram, a supply chain management company for approximately twelve years. She also worked at Target in distribution and managed a Burger King restaurant for five months. (R. 414). According to the claimant, she worked for the same employer for twelve years. Cinram laid off the claimant in January 2010. She collected unemployment benefits for 2010, protectively filed for disability benefits on June 24, 2010, and alleges January of 2011 as her revised

disability onset date. (R. 28).

*Mental Impairments*

On February 5, 2009, the claimant was takem to the Emergency Department of Huntsville Hospital, because she was unresponsive and in respiratory arrest. When conscious, the claimant reported that she drank alcohol while taking her prescribed Xanax and Dilaudid. Upon stabilization and discharge, the discharge nurse instructed the claimant not to take her prescribed medications and drink alcohol at the same time. (R. 270-294).

On September 29, 2010, the claimant visited Assessment and Psychotherapy services of Madison, upon request of the Disability Determination Service.  Licensed psychologist, Erin M. Smith, Psy.D, conducted a clinical interview and a mental status examination. The claimant stated to Dr. Smith that she had a history of bipolar disorder, but did not report having any problems with this condition at the time of the examination. The claimant also reported that she has been diagnosed with an anxiety disorder, obsessive-compulsive disorder, panic attacks, migraine headaches, Arnold Chiari malformation, and arthritis. The claimant said that her panic attacks occur daily, or more frequently when she has to leave the house. The claimant stated that she worries excessively over things she cannot control, and suffers from symptoms including repeated tapping in an even number, repeated counting, hair pulling, and panic attacks. (R. 413).

The claimant described her daily activities: she gets up, fixes coffee, takes medication, and works on the computer. She stated that her husband does all the household chores, and cooking. The claimant said that she can go to the grocery store with her husband once a month, but is unable to drive due to panic attacks, and her social activities are non-existent.

The claimant has a history of psychiatric hospitalization, most recently in 1999 for bipolar

disorder and a suicide attempt. The claimant also stated that she has a problem sleeping because of her pain and discomfort, and has a poor appetite. (R. 414).

Dr. Smith stated that the claimant's cognition appeared to be within the average range; she was able to provide age appropriate similarities and gave adequate interpretations to proverbs; she could register three objects immediately and could recall one of three objects at five minutes delay; her concentration and attention were fair; she could repeat six digits forward and four digits backward; and that she was able to perform arithmetic calculations and serial-three subtraction without errors. Dr. Smith noted that the claimant's responses appeared genuine, and that the claimant did not appear to be exaggerating her difficulties. (R. 415).

Dr. Smith said that the claimant's overall level of social and adaptive functioning, based upon her mental health issues alone, appeared to be severely impaired. Dr. Smith indicated that the claimant's impairments were secondary to her chronic pain disorder and agoraphobia, and that she had generally been able to function at an age-appropriate level in the past. Dr. Smith also said that the claimant's ability to maintain gainful full-time employment, based solely upon her mental health issues, is severely impaired. (R. 416).

Dr. Smith diagnosed the claimant with a panic disorder with agoraphobia; obsessive compulsive disorder; and severe psychiatric, medical, financial and social issues. The doctor assessed the claimant with a GAF score of 45, indicating serious symptoms, or serious impairment in social, occupational, or school functioning. (R. 416).

Dr. Lee Blackmon performed a Psychiatric Review Technique on the claimant on October 1, 2010, upon request of the Disability Determination Service. He did not examine the claimant, but based his findings on information in the record and Dr. Smith's examination records. In assessing

the claimant's anxiety under Medical Listing §12.06, Dr. Blackmon stated that the claimant had anxiety, a panic disorder, and obsessive-compulsive disorder, but that none of these impairments satisfied the listing. Dr. Blackmon also stated that the claimant had a history of opioid abuse, and alcohol intoxication with possible abuse in 2009, but these impairments did not meet the §12.09 listing, and that the evidence did not establish the presence of "paragraph B" or "paragraph C" criteria.

Dr. Blackmon stated that the medical record supports the claimant's allegations that she suffers from anxiety, but that the objective data does not support the alleged severity of anxiety. Dr. Blackmon also stated that the claimant could see improvement in her conditions if she sought further mental health treatment. In his residual functional capacity assessment, he stated that the claimant did not have marked limitations in any category.

Regarding the claimant's functional capacity, Dr. Blackmon stated that the claimant could learn and remember simple work instructions, but not detailed ones; could carry out simple instructions and sustain attention to simple tasks for extended periods; would benefit from a flexible work schedule; would be expected to miss one to two days of work per month due to anxiety; would benefit from casual supervision and would function best with her own work area apart from others to minimize anxiety; could tolerate ordinary work pressures, but should avoid excessive workloads, quick decision making, rapid changes, and multiple demands; would benefit from regular work breaks and a slower pace; should have casual contact with the public; should receive supportive, tactful and non-confrontational feedback from supervisors; could adapt to infrequent, well-explained changes; and should not work around hazards due to poor judgment if intoxicated. Dr. Blackmon indicated that the claimant would need help with long term planning and goal setting, but not short

term planning and goal setting. (R. 423-440).

On October 12, 2010, the claimant went to the Mental Health Center for crisis intervention, and saw a licensed clinical social worker, Janice McAdams. She stated that her problems with OCD had gotten worse since being laid off work. She reported pulling her hair out and constantly washing her hands to the point that they were bleeding. The claimant reported feeling depressed, isolated, worthless, with mood swings, poor concentration, lack of sleep, irritability, agitation and anxiety. Ms. McAdams instructed the claimant to begin therapy regularly and contact the Mental Health Center or the ER if her depression and other symptoms increased. (R. 448-449).

The claimant began regularly attending therapy at the Mental Health Center on November 9, 2010.  She attended therapy one other time in 2010, nine times in 2011, and once in 2012. On November 9, 2010, the claimant saw Dr. Donna Scott, and indicated that she had struggled with agoraphobia and OCD since childhood; reported four suicide attempts in the past; and alleged sleeping poorly and having a poor appetite. (R. 443-447).

 On January 25, 2011, the claimant complained that she was experiencing rapid cycling mood changes. On February 15, 2011, Dr. Scott prescribed Anafranil to treat some of the claimant's symptoms arising from bipolar disorder, OCD, panic attacks and PTSD. On March 29, 2011, the claimant stated that she was improving some with the new medication, but that her husband said that she had been sleep-walking and doing OCD-like behavior in her sleep. At this appointment, Dr. Scott prescribed the claimant Effexor in place of the Anafranil. (R. 464-467).

On April 20, 2011, the claimant came to her regularly scheduled appointment and reported that she had been taken off all of her medication by her general physician, because she had been diagnosed with Tylenol-induced hepatitis, secondary to taking too much Tylenol. Right before this

appointment, Dr. Englert had instructed the claimant that she could resume taking her medications. At her therapy session, the claimant discussed how she had been managing her mental problems without her prescriptions. The claimant stated that she could see a vast difference in her symptoms when on her medication, but had been working in her greenhouse, a process that the claimant said relaxed her. (R. 460).

On August 30, 2011, the claimant requested that Dr. Scott not treat her, and saw Dr. William Goodson. Dr. Goodson prescribed the claimant Anafranil again, along with Depakote. At her September 26, 2011 appointment, the claimant stated that the prescription medications had improved her issues with OCD-like behaviors, and that she had been able to leave the house on a couple of occasions. (R. 455-457).

On February 14, 2012, the claimant came back to the Mental Health Center after missing a couple scheduled appointments. In the meantime, the claimant's mother passed away from cancer, and she reported that her symptoms had increased. She stated that her pain had increased; that she had been pulling out her hair; could hardly function; and had thoughts of harming herself. She also said that her OCD symptoms were worse. Dr. Goodson instructed the claimant to take her medicines as prescribed and to seek emergency assistance if her symptoms increased. (R. 453).

*Physical Impairments*

The claimant has had a number of physical impairments that she has suffered from for years. On May 3, 1993, Dr Frank Haws diagnosed the claimant with syringomyelia, a disorder in which a cyst forms within the spinal cord. At this same time, Dr. Haws also diagnosed the claimant with a type I Arnold-Chiari malformation, which is a structural defect in the cerebellum, the part of the brain that controls balance. (R. 239-246). On November 20, 1995, the claimant reported to Dr. Haws

10

and complained of numbness on her left side. At this time, Dr. Haws installed a shunt of the syringomyelia cyst, and performed a laminectomy of the T1 and T2. (R. 235-246).

In 1999, Dr. Kenneth Willis, at the Alabama Pain Center, placed a spinal cord stimulator to help relieve pain arising from the claimant's syringomyelia. This device stopped working in 2002. In June of 2004, the claimant saw Dr. Rhett Murray with increased numbness on the left side of her face, and hand, and pain in her left shoulder. Dr. Murray ordered an MRI of the claimant's cervical and thoracic spine and found evidence of a possible disc herniation. After the MRI, Dr. Murray ordered a cervical myelogram and post-myelogram CT that showed that the claimant had a disc herniation at C5-6 that was displacing the nerve root in her neck. Dr. Murray suggested a C5-6 anterior cervical discectomy and fusion that he performed on October 11, 2004. (R. 204-229).

Dr. Murray referred the claimant to Dr. Tejanand Mulpur at the Neurology Clinic of Huntsville on May 18, 2007. The claimant complained of left shoulder pain. Dr. Mulpur found that her issues could have been from a mild chronic left C8 radiculopathy. Dr. Mulpur prescribed Lyrica for her chronic pain associated with syringomyelia and suggested that the claimant get her spinal cord stimulator repaired for further relief. (R. 194-204).

In 2008, the claimant began to visit the Alabama Pain Center for treatment of the pain she experienced from the above-mentioned impairments. The claimant went to the Pain Center three times in 2008, eleven times in 2009, and four times in 2010. She constantly complained of lower back pain, hip pain, left buttock pain, left groin pain, and left thigh pain. The claimant underwent a number of procedures to relieve her pain. On March 2, 2009, the claimant visited the Alabama Pain Center for her yearly physical examination. The medical record from this appointment states that the claimant was taking Lortab for pain, Imitrex for migraines, Xanax for anxiety, and an Albuteral

inhaler for her asthma. At her appointment in November 2, 2009, the claimant was prescribed Zanaflex, and her prescriptions for OxyContin and OxyIR were increased. At that appointment, the claimant stated that her pain was at a 7/10. (R. 303-351).

On March 24, 2010, the claimant's treating physician, Dr. Englert, stated that Dr. Kenneth Willis at the Pain Center had increased the claimant's pain medicine to a fairly significant dose of OxyContin, without the claimant complaining of increased pain. Dr. Englert was concerned about this increase in narcotic pain medication, and the claimant stated that she did not want to go back to the Pain Center. He gave her a tapering schedule so that she could gradually reduce the amount of OxyContin she was taking. Dr. Englert stated that after the claimant was weaned off of OxyContin, he would put her back on hydrocodone. (R. 385). The claimant did not return to the Pain Center after June 6, 2010.

On September 8, 2010, the claimant saw Dr. Bhavna Sharma upon the request of the Disability Determination Service. The claimant said that her spinal cord stimulator, which had been repaired, reduced her pain in her neck and shoulder by 4%.[1] She said that she experienced migraine headaches every other day; and that she cannot drive because she has panic attacks. Dr. Sharma stated that the claimant was shaking and about to have a panic attack in his office and had to take Xanax to calm down. Dr. Sharma stated that the claimant was taking Sumatriptan, Ventolon, Symbicort, Crestor, Lortab and Xanax at the time of the examination. Dr. Sharma's diagnosis included syringomyelia, Arnold Chiari malformation, and chronic lower back pain and left hip pain. (R. 399-403).

On September 23, 2010, Dr. Marcus Whitman performed a physical residual functional

---

[1]The record is not clear about when the claimant's spinal cord stimulator was repaired.

capacity assessment upon the request of the Disability Determination Service. When considering the claimant's exertional limitations, Dr. Whitman stated that the claimant could do the following: occasionally or frequently lift up to ten pounds; stand or walk for a total of at least two hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; could push or pull for an unlimited amount of time, other than as shown in the lift and carry categories; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl, but could never climb a ladder/rope/scaffold; was limited in reaching and feeling; had no issues in handling and fingering; could not reach above shoulder level on her left side; should avoid concentrated exposure to extreme cold, wetness or humidity; and should avoid all exposure to hazardous machinery. Dr. Whitman stated that the imaging in the claimant's medical record supported her testimony of neck and back pain, as well as the degree of the impairment. He indicated that the claimant's allegations were moderately well-supported by the medical records. (R. 405-412).

On April 11, 2012, the claimant's treating physician, Dr. Jack Englert wrote a letter outlining the claimant's impairments, at the request of the claimant's attorney. He stated that the claimant had been his patient since 1998 and listed her medical issues as follows: chronic pain syndrome of the neck and shoulder; anxiety; insomnia; frequent migraine headaches; and chronic obstructive pulmonary disease. Dr. Englert also noted that the claimant has a history of bipolar affective disorder and unintentional habitual use of narcotic painkillers, but had done very well discontinuing the use of narcotic medications and had resolved this issue. Dr. Englert held the opinion that the claimant's neck and shoulder pain, which is chronic, along with her anxiety and social phobia, make regular consistent employment extremely difficult, and that the claimant would have extreme difficulty working with her pain. He indicated that regular work schedules would most likely exacerbate the

13

claimant's symptoms, resulting in frequent medical leave from her place of employment. (R. 469).

*ALJ Hearing*

The claimant, along with her attorney, attended a hearing with the Administrative Law Judge on March 20, 2012. Initially, the claimant alleged that her onset date was January 17, 2010. Because the claimant received unemployment compensation benefits during 2010, the ALJ made the claimant amend her onset date to January 1, 2011, after she stopped receiving unemployment benefits. (R. 130). The claimant alleged that she was in hopes of finding a job in 2010, and after investigating all the job possibilities, found that she would not be able to work with her conditions. At that point, "they voluntarily discontinued" the benefits.[2] (R. 28-30).

The claimant was forty-eight years old at the time of the hearing and testified that she had received her GED and took two college courses. The claimant alleged that she had severe impairments, including syringomyelia, bipolar disorder, migraine headaches, osteoarthritis, Arnold Chiari malformations, and chronic asthma. (R. 33-34).

She testified that her most disabling diagnosis was syringomyelia and her chronic asthma. She testified that her pain was a 7/10 with medication, and said that she cannot stand or sit for more than twenty minutes. (R. 40). The claimant stated that her chronic asthma causes her to miss five or six days of work a month. She also testified that she lost her last job because she could no longer perform the functions she was hired to do, and was forced to get other people to pick up items for her. (R. 48).

---

[2] The hearing transcript says "they voluntarily discontinued the workers' compensation." Because the ALJ and the attorney were discussing unemployment compensation benefits right before this statement, the court believes that the attorney mis-spoke and meant to refer to unemployment compensation benefits, not workers' compensation benefits.

The claimant testified that she had been going to her treating physician, Dr. Englert, for pain medication but had not had a physical examination from him in over a year. The claimant also said that Dr. Willis at Alabama Pain Center was no longer managing her pain. (R. 39).

The ALJ asked the claimant some hypothetical questions to determine the amount of weight she could lift. She denied being able to pick up a twenty-pound bag of potatoes or a ten-pound bag of sugar. She stated that she could pick up a gallon of milk with difficulty. The claimant testified that her osteoarthritis affects her shoulder and hip, and is a dull, constant pain. She also stated that she may drive once every six months, and only if necessary.

The claimant then testified that her spinal cord stimulator was replaced about a year ago. She stated that she cannot bathe or dress herself without assistance, and she is unable to bend down and tie her own shoes. She stated that she has issues bending, stooping, and crawling. She said her husband does all the cooking and she does not go grocery shopping. She testified that she never leaves the house. (R. 49-53).

The claimant testified that she was diagnosed with bipolar disorder in 1990. (R. 33-34). She testified that she has been hospitalized for this condition in the past. The claimant also stated that she sees her therapist every two to three months, and Dr. Goodwin manages her medication for her mental impairments. The claimant testified that the manic and depressive stages of her bipolar disorder cycle every two to three months. (R. 46-48).

The ALJ then asked about the claimant's migraines. She stated that she has up to sixteen migraines a month that last approximately three hours. The claimant stated that, when she has a migraine, she must avoid light and noise, and becomes nauseated. (R. 41-42).

After the examination of the claimant, the ALJ examined John McKinney, a vocational

expert. The vocational expert considered the claimant's work history as a production inspector and a fast food manager.

The ALJ presented a hypothetical to the vocational expert for an individual, able to perform the full range of sedentary work, with the following limitations: could occasionally or frequently lift and carry up to ten pounds; would be able to stand and/or walk with normal work breaks at least two hours in an eight-hour working day; would be able to sit with normal breaks for about six hours in an eight-hour day; would be limited to no overhead work, with no reaching and handling of the left, upper extremity; could never climb ropes, ladders or scaffolding; could occasionally climb ramps and stairs; could occasionally perform work activities requiring balancing, stooping, kneeling, crouching, and crawling; would be limited to frequent fingering with the left hand; should avoid concentrated exposure to extremes of cold, wetness or humidity; could not work at unprotected heights or around dangerous machinery; would be limited to unskilled work, requiring only routine, repetitive work; and only occasional interaction with supervisors, coworkers and the public.

After considering this first hypothetical, the vocational expert stated that, while these things would preclude the claimant from her prior work, alternative work would be available in the form of an assembler (DOT 729.684-054, with 500 jobs in the state and 24,000 nationally), hand packager (DOT 753.687-038, with 430 jobs in the state and 20,000 nationally), or garment folder (DOT 789.687-066, 300 jobs in the state and 15,000 nationally).

The ALJ then presented another hypothetical with the same limitations as the first hypothetical, but with the following additional limitations: pain; discomfort; or any other combination of impairments, whether physical or mental, to the extent that it could affect the individual's ability to pay attention, concentrate, and persist for less than two consecutive hours. The

vocational expert stated that generally, an individual is required, in some capacity, to maintain attention and concentration for unskilled, one-and-two-step tasks for two-hour periods to maintain employment. The vocational expert also testified that an individual could not maintain employment if the individual was required to take frequent work breaks beyond those generally scheduled for unskilled work.

The ALJ then factored absenteeism into the hypothetical, and asked whether an individual could miss two or more days per month and maintain employment. The vocational expert responded "[g]enerally that excessive– being able to maintain competitive employment."[3] (R. 53-57).

*ALJ Opinion*

The ALJ denied the claimant's claim for social security benefits on May 4, 2012. First, the ALJ determined that the claimant met the insured status requirements of the Social Security Act through March 31, 2015. The ALJ then determined that the claimant had not engaged in substantial gainful activity since January 1, 2011, the alleged onset date. (R. 12). The ALJ noted that the record showed that the claimant applied for and received unemployment benefits for every quarter in 2010, and received $221.00 per week from May 2011 though September 2011. The ALJ commented that, while he could not find clear evidence of substantial gainful work activity since January 2011, he also noted that in weighing the credibility of the claimant's assertion that she is disabled, her application and receipt of unemployment compensation benefits is a factor he would consider. (R. 13).

The ALJ found that the claimant had the following severe impairments: distant history of

---

[3]This court is unclear as to the meaning of the vocational expert's answer to the question posed by the ALJ.

17

fusion of C5-6 disc; laminectomy at the C1-2 disc; a syringosubarachnoid shunt placed at the T2 disc; placement of a spinal cord stimulator with external charging; asthma; obsessive-compulsive disorder (OCD); and bipolar disorder.

In finding the claimant's migraines non-severe, the ALJ stated that the treatment records did not support the claimant's allegations regarding the severity and frequency of her reported migraines. As evidence of this decision, the ALJ looked at the medical records from March 2009 from the Alabama Pain Center. The ALJ stated that these records showed little notion of migraines until August 2010 when migraines were listed among Dr. Englert's assessment. The ALJ also stated that the record showed that the claimant reported experiencing migraines for over twenty years, and was still able to work the same job for over twelve years.

The ALJ also found the claimants's opioid and alcohol dependency problems non-severe. He looked at the 2009 incident when the claimant was admitted to the emergency department at Huntsville Hospital for an overdose. He also noted Dr. Englert's records that discussed the claimant's tapered pain medication schedule and her unintentional habitual use of narcotic painkillers. The ALJ found that the record supported the fact that the claimant's alcohol and opioid use was not material to the issue of disability in this case. (R. 14).

The ALJ then found that the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The ALJ considered the claimant's degenerative disc disease under Social Security Medical Listing §1.04 (Disorders of the Spine), but concluded that the claimant's condition did not satisfy the severity requirements of this listed impairment, as she does not have the requisite neurological deficits. In addition, the ALJ considered the claimant's chronic asthma under §3.03 (Asthma), but found that her condition did not

show the requisite pulmonary function testing results or attacks, occurring at least once every two months or at least six times a year, in spite of prescribed treatment and requiring physician intervention.

The ALJ then examined the claimant's mental impairments. He considered §12.06 (Anxiety-related disorders) and §12.09 (Substance Addiction disorders) and found that the claimant has moderate restrictions of activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. (R. 15).

The ALJ considered the entire record and determined that the claimant has the residual functional capacity to perform the full range of sedentary work with the following limitations: occasionally and frequently lift and/or carry ten pounds; stand and/or walk, with normal breaks, for two hours in an eight hour workday; sit, with normal breaks, for six hours in an eight hour workday; cannot reach or handle above shoulder level or conduct frequent fingering in the left hand; occasionally perform postural maneuvers, such as climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling; no climbing of ropes, ladders or scaffolds; must avoid concentrated exposure to extreme cold, wetness, and humidity; should avoid all exposure to unprotected heights or dangerous machinery; and can perform routine, repetitive unskilled work as defined by the Dictionary of Occupational Titles and the Regulations; and should have only occasional interactions with supervisors, co-workers, and the general public. (R. 15).

The ALJ stated that while the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they

are inconsistent with his residual functional capacity assessment. The evidence that the ALJ used to discredit the claimant includes the fact that the claimant has had pain management treatment since 1999, and the measures taken to relieve some of the issues arising from her syringomyelia have been effective in relieving pain and numbness. The ALJ considered the fact that the claimant worked the same job from 1997 to 2010, with no objective evidence of increasing symptoms to support her becoming unable to perform her job duties at that time. The ALJ also pointed to the fact that in March 2010, two months after being laid off, Dr. Englert tapered back the claimant's high dose of pain medication. The ALJ stated that this conservative treatment by Dr. Englert discredited the claimant's allegations of severe pain. (R. 16).

The ALJ said that the objective medical evidence is fully consistent with the residual functional capacity and is inconsistent with the allegations of disabling pain. He stated that the record showed no evidence of diagnostic testing since 2007, and clinical examinations were generally unremarkable with only episodic notions of wheezing, consistent with the claimant smoking a pack of cigarettes a day. (R. 16).

The ALJ stated that the claimant's medical treatment and use of medication were not consistent with the disabling levels of pain that she alleged. The ALJ stated that the claimant had a long history of pain, but stopped attending pain management in 2010 because the Alabama Pain Center had increased her medication without any reports of increased pain. The ALJ also pointed out that the claimant's treating physician, Dr. Englert, prescribed the claimant's pain medication, but did not routinely examine her. The ALJ also stated, that in spite of all of the claimant's complaints about pain and her inability to sleep, the record does not indicate that she ever requested a change in her medication.

The record did not contain proof of emergency room visits due to asthma, nor does the record show that the claimant missed five to six days a month because of this condition, as she testified. The ALJ gave weight to the March 2009 examination at the Alabama Pain Clinic, where the claimant stated that her asthma and her pain were managed by medication.

The ALJ also looked at the evidence that the claimant never reported to her treating physician that she had problems with the use of her hands. The ALJ noted Dr. Scott's treatment notes from March 2011, at the Mental Health Center, where the claimant said that she worked in her greenhouse and on the computer as evidence that she had a greater use of her hands than alleged. The ALJ stated that the claimant's failure to report decreased used of her hands to a treating physician, and her ability to work in the greenhouse and on the computer, is inconsistent with the testimony that the claimant has severe restrictions in the use of her arm and hands. The ALJ indicated that the claimant's failure to report problems with her hands and increased pain, to her treating physician, casts further doubt on the credibility of the claimant's subjective complaints. (R. 17).

The ALJ gave little weigh to the claimant's treating physician's opinion. The ALJ stated that Dr. Englert's opinion was not a specific assessment of the nature and severity of the claimant's impairments. The ALJ indicated that Dr. Englert's opinion was an opinion on the claimant's ability to work, which is a decision reserved for the Commissioner. 20 C.F.R. §404.1527(e)(2). The ALJ stated that Dr. Englert's opinion was inconsistent with his own examination records, showing unremarkable findings and no reports of increasing symptoms or requests for changes to the claimant's treatment regimes. The ALJ also discredited Dr. Englert's opinion, because it encompassed the claimant's mental functioning, which is outside of his expertise.

The ALJ gave considerable weight to Dr. Whitman's physical assessment of a range of

sedentary work, and Dr. Blackmon's mental assessment of unskilled work. The ALJ stated that these opinions were consistent with the objective medical evidence in the record. (R. 19).

The ALJ then found that the claimant would be unable to perform any past relevant work as a production inspector or a fast food manager, but found that because the claimant was forty-eight years old at the alleged onset date, she was classified as a younger individual. He also considered the factors that the claimant had a high school education and was able to communicate in English. Because of these factors and the testimony of the vocational expert, the ALJ stated that jobs exist in significant numbers in the national economy that the claimant can perform. He indicated that she could work as an assembler, hand-packager, or a garment folder. For the above-stated reasons, the ALJ found that the claimant was not disabled under the applicable law. (R. 20).

## V. DISCUSSION

### A. Whether substantial evidence supports the ALJ's omission of Dr. Blackmon's limitation that the claimant would need to miss one to two days per month because of her anxiety from the ALJ's residual functional capacity assessment.

This court must consider whether substantial evidence in the record supports the ALJ's residual functional capacity assessment. The ALJ's failure to include, in his residual functional capacity assessment, a limitation for the claimant's absenteeism is not supported by substantial evidence, and this court will reverse and remand the ALJ's determination.

In reaching the RFC assessment, the ALJ must first identify all of the individual's functional limitations or restrictions and assess her work-related abilities on a function-by-function basis, based on all of the claimant's limitations. 20 C.F.R. §404.1545 and §416.945. An ALJ's RFC determination is not a medical assessment, but is "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. §404.1545(a)(1).   The ALJ makes this determination by

considering the claimant's physical, mental, and other abilities affected by the impairment(s). 20 C.F.R. § 404.1545(b)-(d), [20 C.F.R. § 416.945(b)-(d)].

Dr. Blackmon, a licensed psychological consultant, to whom the DDS referred the claimant, assessed that the claimant would "be expected to miss 1-2 days of work per month due to anxiety." (R. 439). The ALJ gave Dr. Blackmon's assessment "substantial weight," yet failed to encompass the limitation of absenteeism in his RFC assessment of the claimant. (R. 19). The ALJ did not explain any reason for this omission; he seemingly chose to ignore Dr. Blackmon's assessment. No other evidence in the record supports the ALJ disregarding Dr. Blackmon's absenteeism limitation, especially in light of the "substantial evidence" he gave other parts of Dr. Blackmon's assessment. As such, substantial evidence does not support the ALJ's failure to accommodate the absenteeism limitation in the RFC.

Although the ALJ failed to include the absenteeism limitation is his RFC assessment, he did question the vocational expert about this limitation. In his hypothetical, the ALJ asked whether an individual with the claimant's age, education, and work experience, would be able to maintain employment and also miss up to two days of work a month. The vocational expert responded, "[g]enerally that excessive–being able to maintain competitive employment." (R. 57).

Although the vocational expert's response is not entirely clear in the record, the vocational expert seemed to testify that missing up to two days a month would be "excessive" and thus preclude the claimant from any type of employment. Perhaps the vocational expert's indication that the absenteeism would prevent the claimant from working led the ALJ to ignore that limitation. If the ALJ had explained this omission and explained why the claimant would not have to miss as many days, the court would not have to speculate whether missing one to two days a month would preclude

the claimant from performing all jobs in the sedentary level.

The law requires the ALJ to include all of the claimant's limitations in the RFC assessment. This court finds that substantial evidence does not support the ALJ's *omission* of Dr. Blackmon's absenteeism limitation in the residual functional capacity assessment.  For this reason, this court will reverse and remand the decision for the ALJ to reconsider Dr. Blackmon's opinion, regarding the absenteeism limitation, and to clarify the vocational expert's testimony.

### VI. CONCLUSION

For the above stated reasons, the court finds that, because of the unclear testimony of the vocational expert and the lack of an absenteeism limitation in the residual function capacity assessment, the court will reverse the Commissioner's decision and will remand it for the ALJ to determine whether the claimant is entitled to disability benefits.

A separate order will be entered.

DONE and ORDERED this 17th day of February, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE